**APPLICATION AND AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANTS AND CRIMINAL COMPLAINT**

I, Michael Mitchell, Special Agent, being duly sworn, state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and, acting as such, I am a "federal law enforcement officer" within the meaning of Fed. R. Crim. P. 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the United States Attorney General to request a search warrant.

2.      I have been employed by the FBI as a Special Agent since August 2021 and have been assigned to the Cleveland Division (FBI-CLE) since January 2022.  I have been assigned to the Joint Terrorism Task Force (JTTF), and have participated in investigations involving terrorism crimes, national security offenses, and general criminal matters such as firearms and drug offenses. I have participated in the usual methods of investigation including, but not limited to, financial analysis, physical surveillance, telephone toll record analysis, consensual monitoring, and the execution of search and arrest warrants. Prior to becoming an FBI Special Agent, I served as a Customs and Border Protection Officer from August 2012 through July 2021.

3.      During the course of my employment as an FBI Special Agent, I have participated in investigations involving the use of search warrants to collect evidence, including firearms, and other types of evidence that document criminal activities. To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources including physical and electronic surveillance, various types of infiltration (including undercover agents, informants, and cooperating sources), pen register and trap and trace devices, GPS and telephone tracking devices, and audio and audio/video recording devices.

1

4.      The facts set forth in this affidavit are based on my personal knowledge, knowledge obtained during my participation in this investigation, knowledge obtained from other individuals, including other law enforcement personnel, my review of records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience.  Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for search and seizure warrants, this affidavit does not set forth each and every fact learned by me during the course of this investigation.

**PURPOSE**

5.      This affidavit is submitted in support of an application for search and seizure warrants for the following locations and persons pursuant to Rule 41 of the Federal Rules of Criminal Procedure for evidence, fruits, and instrumentalities, as further described in ATTACHMENTS B-1 through B-5, of the below criminal offenses (hereinafter, "TARGET OFFENSES"):

      a.      **SUBJECT PREMISES 1**: the residence of **GEORGE BAYNES**, a/k/a "Issa Yusef," as further described at Attachment A-1;

      b.      **SUBJECT PREMISES 2**: the residence of **AARON BETTS**, a/k/a "Harun," as further described at Attachment A-2;

      c.      **BAYNES' PERSON:** as further described at Attachment A-3;

      d.      **BETTS' PERSON:** as further described at Attachment A-4; and

      e.      **SUBJECT VEHICLE 1:** a silver 2014 Jeep Patriot, bearing license plate "MRBETTS," which is **BETTS'** motor vehicle, as further described at Attachment A-5.

6.     This Affidavit is also submitted in support of a Criminal Complaint charging **BAYNES** and **BETTS** with the following criminal offenses (hereinafter "TARGET OFFENSES"):

a.     Title 18, United States Code, Section 554(a), Attempted Smuggling of Goods from the United States[1] (**BAYNES**).

b.     Title 18, United States Code, Section 922(d)(1), Selling or Disposing of a Firearm to a Convicted Felon[2] (**BAYNES** and **BETTS**);

c.     Title 18, United States Code, Section 922(g)(1), Felon in Possession of a Firearm[3] (**BAYNES**);

d.     Title 18, United States Code, Section 932(b), Straw Purchasing of Firearms[4] (**BETTS**);

e.     Title 18, United States Code, Section 932(b), Conspiracy to Straw Purchase Firearms[5]  (**BAYNES and BETTS**);

---

[1] 18 U.S.C. § 554(a)(1) provides in pertinent part: "Whoever fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States, shall be fined under this title, imprisoned not more than 10 years, or both."

[2] 18 U.S.C. § 922(d)(1) provides in pertinent part: "It shall be unlawful for any person to sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person … has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year."

[3] 18 U.S.C. § 922(g)(1) provides in pertinent part: "It shall be unlawful for any person— … who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year … to … possess in or affecting commerce, any firearm or ammunition."

[4] 18 U.S.C. § 932(b) provides: "It shall be unlawful for any person to knowingly purchase, or conspire to purchase, any firearm in or otherwise affecting interstate or foreign commerce for, on behalf of, or at the request or demand of any other person, knowing or having reasonable cause to believe that such other person—
(1) meets the criteria of 1 or more paragraphs of section 922(d);
(2) intends to use, carry, possess, or sell or otherwise dispose of the firearm in furtherance of a felony …; or
(3) intends to sell or otherwise dispose of the firearm to a person described in paragraph (1) or (2)."

[5] *See* footnote 4.

f.      Title 18, United States Code, Section 933(a)(1), Firearms Trafficking[6]

(**BAYNES** and **BETTS**);

g.      Title 18, United States Code, Section 933(a)(1) and (3), Firearms

Trafficking Conspiracy[7] (**BAYNES** and **BETTS**); and

h.      Title 18, United States Code, Section 1958(a), Murder-for-Hire[8]

(**BAYNES**).

## COOPERATING WITNESS

7.      The investigation outlined herein involves a cooperating witness (referred to herein as "CW-1"). CW-1 is not an anonymous source and has interacted directly with investigators involved in this investigation.  CW-1 is currently motivated by the possibility of receiving monetary compensation.[9]  CW-1 has been interviewed by law enforcement.  A portion of the interviews were in-person, the interviewing agents were fully aware of CW-1's identity, and CW-1 did not attempt to obscure his or her identity in any manner.  The requirement that CW-1 provide

---

[6] 18 U.S.C. § 933(a)(1) provides in pertinent part: "It shall be unlawful for any person to— … ship, transport, transfer, cause to be transported, or otherwise dispose of any firearm to another person in or otherwise affecting interstate or foreign commerce, if such person knows or has reasonable cause to believe that the use, carrying, or possession of a firearm by the recipient would constitute a felony."

[7] 18 U.S.C. § 933(a)(3) makes it a crime to "attempt or conspire to commit the conduct described" in 18 U.S.C. § 933(a)(1).

[8] 18 U.S.C. § 1958(a) provides in pertinent part: Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined under this title or imprisoned for not more than ten years, or both; and if personal injury results, shall be fined under this title or imprisoned for not more than twenty years, or both; and if death results, shall be punished by death or life imprisonment, or shall be fined not more than $250,000, or both.

[9] Agents recently reviewed records documenting CW-1 opening as a source for the FBI.  This review showed that CW-1 originally was reported to have also requested to have their prior convictions expunged.  To your affiant's knowledge, CW-1 was never promised that this would occur and has continued to cooperate in order for monetary compensation.

4

only truthful information was stressed to CW-1 at the beginning of his or her cooperation. CW-1 has direct access to **BAYNES** and is aware of his affiliation with firearm trafficking.  CW-1 has provided current information on **BAYNES**.  CW-1 has had direct access to the cellular telephone number used by **BAYNES**.  CW-1 has prior felony criminal convictions which include, but are not limited to, drug related charges.  CW-1's convictions will not be detailed herein as doing so could reveal the identity of CW-1.

8.      Even considering CW-1's criminal history, your Affiant believes that the information provided by CW-1 is reliable, as some of the information CW-1 has provided has been corroborated by law enforcement at this time. CW-1 has also provided information regarding various other past investigations which have also been separately corroborated by law enforcement.

9.      All the meetings or telephone calls between CW-1 and **BAYNES** and/or **BETTS** described herein were audio recorded, unless indicated otherwise.

## PROBABLE CAUSE

### *Summary of Investigation*

10.      The investigation into **BAYNES** began in the fall of 2023.  FBI-CLE JTTF Agents received information that stolen firearms were being sold out of a mosque in Cleveland, Ohio. Initially, agents did not know the identity of the individual selling the firearms.  Agents eventually learned that **BAYNES** was the individual believed to be selling firearms, although it was never confirmed that he was selling them out of the mosque. The investigation resulted in the controlled purchase of seven firearms by CW-1, a convicted felon, from **BAYNES** in December 2023.  After these controlled purchases, **BAYNES** attempted to obtain additional firearms for CW-1 to smuggle overseas.  When **BAYNES** could not obtain additional weapons from his original firearms

supplier, **BAYNES** enlisted the help of **BETTS** to obtain firearms for CW-1.  On April 19, 2024, **BETTS** sold two firearms to CW-1 at **BAYNES'** residence, **SUBJECT PREMISES 1**.  The following day, April 20, 2024, **BETTS** straw purchased three firearms at a Cleveland area gun show for CW-1.  **BAYNES** also provided CW-1 with firearms magazines and a gas mask to smuggle overseas with the firearms and discussed with CW-1 smuggling parts for creating pipe bombs as well.  In addition to these firearms transactions, **BAYNES** also solicited CW-1 to murder an individual he knows from his mosque in Cleveland, Ohio.

*Relevant Background on BAYNES*

11.     **BAYNES** and CW-1 met at a mosque in Cleveland, Ohio, in late 2023.  **BAYNES** provided CW-1 with his cellular telephone number, which ended in 0333.[10]  Since their initial meeting, **BAYNES** and CW-1 have met multiple times in person.  They have also communicated multiple times using the telephone number ending in 0333 that **BAYNES** provided to CW-1.

12.     Investigators reviewed **BAYNES'** criminal history, which includes the following prior felony convictions:

> a.     December 4, 1981, Convictions for Carrying a Concealed Weapon in violation of Ohio Revised Code 2923.12 and Unlawful Possession of a Dangerous Ordnance in violation of Ohio Revised Code 2923.17. **BAYNES** was sentenced to a term of two to ten years for the Concealed Weapon charge and a term of one to five years on the Dangerous Ordnance charge, to run consecutive to one another, and to be served at the Columbus Correctional Facility.

---

[10] Investigators have learned through legal process that the telephone number provided by **BAYNES** ending in 0333 is associated with a cellular telephone having International Mobile Subscriber Identity 311480368056894, that is subscribed by Verizon Wireless.

b.        November 19, 1990, Conviction for Carrying a Concealed Weapon in violation of Ohio Revised Code 2923.12. **BAYNES** was sentenced to a term of two to ten years to be served at the Lorain Correctional Facility.

c.        January 27, 1995, Conviction for Grand Theft in violation of Ohio Revised Code 2913.02 and Gross Sexual Imposition in violation of Ohio Revised Code 2907.06(A)(1). **BAYNES** was sentenced to a term of six months in the Lorain Correctional Facility.

13.       In addition to these felony convictions, **BAYNES** was also convicted of Assault, a 1st Degree Misdemeanor, in 2018.  **BAYNES** has also been charged twice with murder but was not convicted in either case.

14.       **BAYNES** has provided additional information about his background and prior criminal history during communications and meetings he had with CW-1.  For example, during a meeting on December 1, 2023, **BAYNES** told CW-1 that he has had corrupt police officers give him guns.  **BAYNES** also told CW-1 that he has killed three cops. **BAYNES** further told CW-1 that, in the past, he had taken trains to New York City, Philadelphia, and Detroit for the purpose of transporting, and ultimately selling, large bags filled with guns.  **BAYNES** has told CW-1 that he always carries a gun on him.  During meetings with CW-1, **BAYNES** frequently boasted about how violent he was.  For example, during a meeting on April 26, 2024, **BAYNES** bragged, "I was a murderer and didn't give a f\*\*k about killing in broad daylight or dark."  **BAYNES** further claimed that "the way I did it was so brutal and vicious" and that he "was a shotgun man."  A report of an interview of **BAYNES'** state parole officer conducted in 2004 corroborates **BAYNES'** claim to be especially violent.  According to the report, the state parole officer described **BAYNES**

as the most dangerous and violent parolee he had ever supervised and said that **BAYNES** had a fascination with sawed off shotguns and automatic weapons.

15. **BAYNES** also talked on multiple occasions about his past involvement with shipping weapons overseas to groups in the Middle East, traveling to other countries to provide military-style training, and operating a military-style training camp in the United States. For example, on December 15, 2024, **BAYNES** stated that he used to have access to grenades and bazookas and ran a training camp in Ohio where he provided training in guerilla tactics to people affiliated with groups overseas. On January 5, 2024, **BAYNES** discussed previously sending grenades, bulletproof vests, and AK's[11] to groups overseas. Similarly, on March 22, 2024, **BAYNES** said that he used to teach how to break down weapons and build bombs and that he traveled to multiple countries to train groups to kill people.

### *Baynes' Knowledge that CW-1 is a Convicted Felon*

16. CW-1 has made statements directly to **BAYNES** or in his presence that indicated that CW-1 was a convicted felon who had served time in prison. During their conversation on December 1, 2023, while discussing other individuals that would particularly struggle in federal prison, CW-1 told **BAYNES** that they did their "time" in 2011 initially at the "Ohio holding facility," before being sent to Mississippi.

17. On December 6, 2023, prior to the controlled purchase of firearms described below, when discussing **BAYNES**' desire not to go back to prison, CW-1 told **BAYNES** that they did "fed" time themselves and they did not want to go back.

---

[11] "AK" is a reference to an automatic rifle commonly known as an AK-47, which was originally produced in the Soviet Union for the military. AK-47 is short for Avtomat Kalashnikova Model 1947, as the rifle was originally designed in 1947. The rifle fires a 7.62 mm round. The AK-47 became a common rifle used by militaries and armed groups throughout the world. "AK" is a colloquial reference to the many versions and similarly styled rifles that have been produced since the original, which include civilian and semi-automatic versions.

18. On December 15, 2023, **BAYNES** and CW-1 were together talking when an unknown male approached them. **BAYNES** began talking to the unknown male, later identified as someone with the initials A.S. A.S. mentioned he just got back to the Cleveland area from Louisiana. CW-1 asked A.S. what part of Louisiana. While in **BAYNES**' presence, CW-1 told A.S. that they were in the "fed" in Yazoo City, that they came home from prison in 2014, and that they were in prison for "841" and "841a" charges, which is a reference to federal drug offenses codified at Title 21, United States Code, Section 841.

19. On April 19, 2023, CW-1, **BAYNES,** and **BETTS** discussed whether **BAYNES** and CW-1 should attend a gun show with **BETTS**. During this conversation, in **BAYNES**' presence, CW-1 said of himself and **BAYNES**: "We both felons so we can't be in there."

### December 6, 2023, Firearms Transaction

20. On December 1, 2023, **BAYNES** offered to sell CW- 1 four handguns he described as a MAC-10, a MAC-11, a 1911, and a .357 caliber revolver. **BAYNES** offered to sell the four handguns, along with extra magazines, to CW-1 for $7,500. **BAYNES**' offer to sell the firearms occurred after CW-1 mentioned a mutual associate who sold firearms. **BAYNES** then started to describe his own firearms trafficking, offering up, "I got Mac-10's and Mac-11's I'm selling. I take my stuff to New York." **BAYNES** made multiple additional statements about trafficking in firearms. For example, he told CW-1 that he wanted $2,500 for the Mac-10's and Mac-11's because "[t]hat's what I get for them up in New York." He elaborated, "Them and automatic weapons and semi-automatic weapons I take them up to New York." Further, Baynes explained, "Handguns, I sell some here, most of them, New York, Philly, Detroit. … I got people who, I give them a bag of guns, they give me the money." According to **BAYNES**, "Every now and then I sell some ammo or gun or something." **BAYNES** eventually offered to sell the CW-1 four guns

for $7,500: "Both Macs, and the .45, and the .357, that'd be 75."  During this meeting, CW-1 discussed with Baynes having previously served time in federal prison.

21.     Later in the day on December 1, 2023, CW-1 called **BAYNES** to establish the parameters of the firearms purchase. CW-1 agreed to meet **BAYNES** on or about December 6, 2023, at approximately noon. **BAYNES** told CW-1 to have cash in hand.

22.     On or about December 6, 2023, CW-1 met with your affiant prior to driving to the meeting with **BAYNES**. CW-1 and their vehicle were searched for contraband. No contraband was found. CW-1 was then provided $7,500 for the controlled purchase of firearms.

23.     At approximately 10:45 a.m., CW-1 called **BAYNES** to confirm that the transaction would be taking place. Your affiant turned on the recording device, began the recording with an introduction, and handed the recording device to CW-1. CW-1 then made their way to the meeting. At approximately noon, **BAYNES** met with CW-1.

24.     After initially meeting, **BAYNES** and CW-1 drove to an empty lot in the area of 1364 E. 85th Street, Cleveland, OH 44106.  CW-1 dropped **BAYNES** off on E. 85th then drove back to another location to wait to hear back from **BAYNES**. CW-1 waited approximately 30 minutes before hearing from **BAYNES**. CW-1 then drove back to E. 85th and met with **BAYNES**. **BAYNES** had the four firearms he said he would have, the MAC-10, MAC-11, 1911, and .357 revolver.[12]  **BAYNES** sold CW-1 all four firearms for $7,500.

---

[12] The four firearms that were ultimately purchased were as follows: (1) Taurus .357 caliber Revolver with serial number 9772, (2) Masterpiece Arms MPA30 9-millimeter caliber Pistol with serial number F8969, (3) Para- Ordnance Manufacturing 1911 SSP .45 caliber Pistol with serial number P168922, and (4) Full Metal Jacket PM11 9-millimeter caliber Pistol with serial number 94-0005376. None of the firearms were loaded.

 

 

25.     At the beginning of the meeting, **BAYNES** was very paranoid that CW-1 was working for the police.  He made CW-1 lift their shirt to see if they were wearing a wire. They also called a mutual friend on the phone who had to vouch for CW-1's reliability. **BAYNES** told CW-1 he was too old to go back to jail.  **BAYNES** wanted CW-1 to be aware that he always has a gun on his person and that if he saw that he was being set up, he would kill CW-1 and the cops. Later, again before the controlled purchase, **BAYNES** told CW-1 not to put him in prison.

26.     After the purchase was complete, CW-1 met with your affiant. CW-1 turned over the four firearms, the recording was concluded, and CW-1's vehicle was searched for contraband. No contraband was located. CW-1 observed **BAYNES** with his phone during the gun purchase.

27.     The MAC-11 that was purchased by CW-1 was traced back to the purchaser, who was a former Cleveland police officer.  As noted above, **BAYNES** previously told CW-1 that police officers had provided him firearms in the past.  The firearm traced back to the name of a police officer that **BAYNES** named to CW-1 as someone who provided firearms to him.  Agents

11

were able to confirm that this individual worked for and ultimately retired from the Cleveland Police Department before passing away in the late 1990's.

28.     Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Special Agent John Sabol, who has specialized training in determining where firearms are manufactured, was presented with the make and models of the firearms sold to CW-1.  On or about February 21, 2024, ATF Special Agent John Sabol opined that the MAC-10, MAC-11, 1911, and .357 revolver were manufactured outside the State of Ohio.

### *December 13, 2023, Firearms Transaction*

29.     On December 8, 2023, **BAYNES** called CW-1 and stated he had more firearms for him. This call was not recorded. CW-1 met with **BAYNES** at a mosque prior to prayer, and **BAYNES** showed CW-1 images of firearms that he had available to sell on his phone. **BAYNES** handed his phone to CW-1 which revealed an Instagram messaging chat between **BAYNES** and a firearms supplier.  The firearms supplier was later identified by agents and is referred to herein as "Supplier 1."  Supplier 1 is a convicted felon and currently has an active warrant in the Northern District of Ohio for felon in possession of a firearm.  CW-1 identified **BAYNES'** Instagram username to agents.[13]

30.     CW-1 saw numerous photographs of firearms in the Instagram chat between **BAYNES** and Supplier 1**,** some of which appeared to be new and in original packaging. Supplier 1 appeared to be the one who had the firearms available to sell to CW-1 through **BAYNES**. CW-1 expressed interest in purchasing an AR-15, MAC-10, and Glock.[14] CW-1 and **BAYNES** agreed

---

[13] **BAYNES** and CW-1 never corresponded with each other through Instagram. When communicating, it was always direct calls.

[14] AR-15 is a rifle that stands for Armalite rifle, which is an ode to the company that developed the firearm. An AR-15-style rifle is a semi-automatic rifle that is traditionally chambered in 5.56x45 millimeter ammunition. The MAC-10 refers to the same style of weapon purchased previously from **BAYNES** as described in an earlier footnote. Glock

on a price of $7,000 for all three firearms based on the following breakdown: $3,500 for the AR-15, $2,500 for the MAC-10, and $1,000 for the Glock.

31.     Later in the day on December 8, 2023, **BAYNES** contacted CW-1 and stated that the guns were dropped off at **BAYNES'** house. **BAYNES** said CW-1 would not be able to back out of the deal at this point. This call was not recorded.

32.     Still later in the day on December 8, 2023, **BAYNES** called CW-1 to say the price of the three firearms had been raised to $7,500 because of the number of accessories that came with the firearms. The accessories included 30-round magazines, a tripod, and a magazine clamp. This call was not recorded.

33.     On December 12, 2023, **BAYNES** contacted CW-1 to confirm that the gun purchase would occur the following day, on December 13, 2023. This call was recorded.

34.     On December 13, 2023, CW-1 met with your affiant prior to driving to the predetermined meeting location, which was **SUBJECT PREMISES 1**. CW-1's vehicle was searched for contraband. No contraband was found. CW-1 was then provided $7,500 for the controlled purchase. Your affiant turned on the recording device, began the recording with an introduction, and handed the recording device to CW-1.

35.     CW-1 then made their way to **SUBJECT PREMISES 1**. CW-1 contacted **BAYNES** when they were approximately five minutes away from **SUBJECT PREMISES 1**. Upon arriving at **SUBJECT PREMISES 1**, **BAYNES** was observed exiting **SUBJECT PREMISES 1** with an Amazon box and a black rifle bag. **BAYNES** brought the Amazon box and the black rifle bag to CW-1's vehicle. **BAYNES** removed a MAC-11, a Glock, and extra magazines from the Amazon box. One of the magazines was loaded with .223 caliber rounds. CW-1 inspected the MAC-11 and

refers to the Austrian gun manufacturer known for producing polymer-framed, semi-automatic pistols. Most well-known and well-utilized Glock pistols are chambered in 9-millimeter ammunition.

Glock and placed them in a backpack that CW-1 already had inside the vehicle.  **BAYNES** then gave CW-1 the black rifle bag, which contained an AR-15.[15]  CW-1 provided **BAYNES** with $7,500 to complete the purchase.  The following photos depict the firearms sold by **BAYNES** on December 13, 2023:






36.     After the purchase was complete, CW-1 met with your affiant. CW-1 turned over the three firearms, the recording was concluded, and CW-1's vehicle and person were searched for contraband. No contraband was located. CW-1 confirmed that some of the firearms purchased matched those in the photographs from the Instagram conversation between **BAYNES'** username and Supplier 1 that they had seen on **BAYNES'** phone. Not only was this controlled purchase

---

[15] The three firearms that were ultimately purchased from **BAYNES** were as follows: (1) Ruger AR-556 5.56 caliber Rifle with serial number 857-53554, (2) Leinad PM-11 9-millimeter caliber Pistol with serial number 94-0027837, and (3) Glock 45 9-millimeter caliber Pistol with serial number BPUK003. The Ruger rifle was loaded with 5.56 caliber ammunition. There were four empty rifle magazines, three empty pistol magazines, four extended pistol magazines, a Glock gun box, and a black Ruger rifle bag.

audio-recorded, but it was also video-recorded via aerial surveillance. CW-1 confirmed that they saw **BAYNES** with his phone during the purchase. Based on the make and model, ATF Special Agent John Sabol provided a verbal opinion that the MAC-11, AR-15, and Glock were manufactured outside the State of Ohio.

37.     On March 22, 2024, investigators obtained a search warrant for the contents of the Instagram accounts used by **BAYNES** and Supplier 1 in the Northern District of Ohio. On April 9, 2024, agents received the contents of the Instagram accounts, as authorized by the search warrant.   The records showed that **BAYNES** and Supplier 1 contacted, or attempted to contact, each other several times between December 3, 2023, and March 22, 2024. They did not direct message each other, but instead would call or, in some instances, send photographs. Significantly, on December 8, 2023, five days before the second gun purchase by CW-1, **BAYNES** and Supplier 1 had seven calls via Instagram.  Supplier 1 also sent the following photograph to **BAYNES** and two other Instagram usernames.



38. The records also showed that on December 9, 2023, **BAYNES** and Supplier 1 had one phone call, and Supplier 1 sent **BAYNES** and one other Instagram username the following photograph:



39. Finally, the records showed that on December 21, 2023, Supplier 1 sent **BAYNES** the following picture:



16

*Efforts to Obtain Firearms to Ship Overseas*

40.     After **BAYNES** sold the above-described firearms to CW-1 on December 6, 2023, and December 13, 2023, **BAYNES** and CW-1 continued to discuss additional firearms transactions, including plans to obtain and ship firearms outside the United States.

41.     On December 15, 2023, **BAYNES** and CW-1 met again.  In addition to **BAYNES** talking to CW-1 about his past support for groups overseas, **BAYNES** told CW-1 he could not only modify CW-1's AR rifle to make it fully automatic, but he could also get brand new, fully automatic AR's any time CW-1 wanted.  **BAYNES** said he had access to mini-AR's and full AR's, with a brand-new AR costing $25,000.

42.     On January 5, 2024, **BAYNES** met again with CW-1.  During this meeting CW-1 told **BAYNES** they knew people in Baltimore who were sending humanitarian items overseas. CW-1 said they were going to send items like "masks, clothes," "bottles of water," and "humanitarian stuff."  CW-1 also said that they were told they could put anything they wanted in the shipments because they would not go through customs.  CW-1 then asked for **BAYNES**' advice on how they "should play that situation."  They further asked if they "should go the whole way or what?"  **BAYNES** responding by asking, "What are you talking about doing?"  CW-1 responded, "Like, you already know."  **BAYNES** said, "Yeah." After **BAYNES** confirmed that the person in Baltimore was already on board, **BAYNES** told CW-1, "You go all the way then."  **BAYNES** warned CW-1 to be careful because others could cooperate against them.   The following exchange then took place:

> CW-1:       What you thinking I should do then?
>
> **BAYNES**:    Start off with just sending anything that's legal.  The *gun* thing, wait.
>                Wait and see how it's going and what's going.

Shortly after, **BAYNES** again said to send other things before the guns:

> CW-1:      Then afterwards, like what, wait till like summer, then what?
>
> **BAYNES**:   Then you can start doing it.
>
> CW-1:      Like what? Like what, sending the, um …
>
> **BAYNES**:   *Guns.*
>
> CW-1:      Ok.
>
> **BAYNES**:   Yeah.

43.     CW-1 continued to ask for advice on how to ship guns because CW-1 said they knew **BAYNES** had more experience.  **BAYNES** conceded that he had experience running guns. As part of his advice, **BAYNES** told CW-1: "You want all brand-new stuff.  You want assault weapons, you know, like them AR's. … You want to send that. … I can get the AR's and the MAC-10's and they can convert them over there."  CW-1 also asked what else they could send over, and **BAYNES** responded that they should see if they could get some grenades.  When CW-1 said they could not get grenades, **BAYNES** said that he could obtain grenades.  **BAYNES** said if they had the money, they could get anything.  When CW-1 asked about how much money they would need, **BAYNES** made clear that he would get paid for obtaining the weapons.  During this meeting, **BAYNES** told CW-1 he had previously shipped grenades, bullet proof vests, and AK's overseas.

44.     On February 2, 2024, **BAYNES** and CW-1 met and discussed sending firearms overseas. **BAYNES** said if CW-1 started sending guns, they could put an order in. CW-1 would just have to let **BAYNES** know how many and what kinds of guns. **BAYNES** told CW-1 to ship the guns with other packages so that no one would know who shipped what. **BAYNES** told CW-1 that they needed to order a minimum of 10 guns. CW-1 also said they wished they could get their

18

hands on a grenade to send over there. **BAYNES** said he could get them some grenades and that they came 10 in a box. During the meeting, CW-1 told **BAYNES** that they had made 3 or 4 shipments already of shoes, band-aids, water, and stuff like that. **BAYNES** asked CW-1 about shipping guns:

> **BAYNES**: And so, brother, if you want to start shipping them things over just let me know. I can put an order in for a shipment but you gotta let me know how much, uh, how many you want, what you want.
>
> CW-1: Yeah, how would you do it though? Would you just like, what, you do it this trip, or like what?
>
> **BAYNES**: Well, when you know, when they put them, you don't want to be the only one sending something.

45. On February 9, 2024, **BAYNES** and CW-1 met and discussed sending guns overseas. CW-1 asked: "I'm just trying to think like what should we send over for? Like what you think we should send over there?" **BAYNES** responded, "You know, you gotta send the ammo, the clips, and the belts. You know the clips go, you know, ammo belts." CW-1 further asked, "What type of guns you think?" **BAYNES** suggested, "Well, it-it-it if they tell me—if they, that what they want. Them AR-15s. … Or M16s or AK 47s. Any military assault weapon that you can makeshift or fully, they want. Semi or fully they gonna want."

46. On February 16, 2024, CW-1 and **BAYNES** met and drove to dinner together. CW-1 and **BAYNES** began discussing purchasing firearms to send overseas. They agreed on looking for 10 assault rifles to ship. **BAYNES** then tried contacting Supplier 1's Instagram account to inquire about 10 assault rifles. When he did not answer, **BAYNES** called Supplier 1's phone number. A man spoke to **BAYNES** on the phone, and **BAYNES** asked about purchasing 10 assault

19

rifles. Supplier 1 said he would contact his two sources and give **BAYNES** a call back. After the call ended, **BAYNES** showed CW-1 Supplier 1's Instagram account.  CW-1 observed numerous photographs of firearms sent by Supplier 1 to **BAYNES**.  These were new photographs that CW-1 had not previously seen. In other words, they were not the same photographs from the earlier purchases of firearms from December.

47.    On February 21, 2024, **BAYNES** and CW-1 spoke in a consensually recorded phone call.  During the call, **BAYNES** complained that his firearms supplier (Supplier 1) was not returning his calls and could not be found.  During this call, CW-1 indicated that there was no rush to obtain the firearms, telling **BAYNES**, "We got time anyway."

48.    On February 23, 2024, **BAYNES** and CW-1 met again. **BAYNES** told CW-1 that Supplier 1 had been on the run for four years for shootings, drugs, and guns. **BAYNES** had recently lost contact with Supplier 1, but prior to losing contact, Supplier 1 had told **BAYNES** he had four AR-15's, could get two more, and eventually could get the rest of them. **BAYNES** said he had continued to reach out to Supplier 1 to purchase the firearms but to date had not heard back from Supplier 1 regarding the firearms. In response, CW-1 suggested that they move on from their plan to obtain firearms: "What do you think we should do, just say forget it?"  **BAYNES** rejected that suggestion, "No, we have to wait, see if we can find somebody else."

49.    On or about March 1, 2024, **BAYNES** met with CW-1 again and said he was having trouble contacting Supplier 1.  He was worried the "feds" got him.  When **BAYNES** explained this, CW-1 told him, "However you want to play it," and, "It ain't no rush."  **BAYNES** responded to this by suggesting, "I have to send guys to the, uh, gun show, get 'em two at a time."  Later in the conversation, CW-1 repeated to **BAYNES** that, "Whatever happens, it don't matter."  CW-1 also repeated that they could proceed "however you think we should play it," and "if he ain't

20

around, however, you want to play it." **BAYNES** again suggested getting guns at gun shows: "That's how we do it."

50.     On March 5, 2024, **BAYNES** told CW-1 that he found out Supplier 1 was in the hospital due to kidney failure and may soon die. On March 13, 2024, the FBI confirmed that Supplier 1 had been admitted to University Hospital but was discharged on March 6, 2024.

51.     On March 15, 2024, **BAYNES** updated CW-1 that Supplier 1 was not doing well and was still in the hospital.[16] CW-1 asked, "So what you think we should do then?" **BAYNES** responded, "We gotta find somebody who can do it." **BAYNES** suggested someone he called "Harun," who was later identified as **BETTS**, might help them. **BAYNES** and CW-1 then discussed further how to obtain firearms at gun shows, with **BAYNES** explaining they should only buy two at a time, and not buy too many at once, to avoid attention. **BAYNES** told CW-1 that to get more guns, they would either have to find someone new to produce the guns or purchase the guns at gun shows. **BAYNES** expressed a willingness to go to gun shows himself to purchase the firearms. **BAYNES** and CW-1 also discussed pipe bombs and sending pieces of aluminum pipe already cut for pipe bombs overseas. **BAYNES** again bragged about how groups in the past "used to buy guns from me in big bulks and send them overseas when I had the connection."

52.     During a meeting on March 22, 2024, **BAYNES** and CW-1 again discussed what they were going to do about getting firearms. **BAYNES** said they would get someone to go to gun shows for them. CW-1 told **BAYNES** they would also ship over the rifle and 2 Macs that they already purchased. **BAYNES** responded, "That's cool."

---

[16] On March 26, 2024, agents learned that Supplier 1 was admitted to the Emergency Room at University Hospitals on March 16, 2024. On March 18, 2024, Supplier 1 was discharged from the hospital.

53.     Later in the day on March 22, 2022, **BAYNES** called CW-1 to say he may have found someone willing to sell two guns. **BAYNES** said he would follow up with more details when he received them.

54.     On March 29, 2024, **BAYNES** and CW-1 discussed the individual who was potentially willing to sell two guns. **BAYNES** said he thought Supplier 1's cousin was going to be able to sell them guns, but it did not work out. **BAYNES** again suggested getting someone to go buy guns for them at gun shows.

55.     On April 4, 2024, **BAYNES** contacted CW-1 to say that he believed "Harun" would be willing to go to a gun show to purchase guns for them. CW-1 learned that "Harun" served in the United States Army and now worked at a local Cleveland area school.  **BAYNES** had "Harun" on the phone with him. "Harun" agreed to **BAYNES**' plan to purchase guns from gun shows. **BAYNES** and "Harun" agreed to set up a meeting with CW-1.  **BAYNES** and CW-1 said they would discuss more details the following day. This call was not recorded.

56.     On April 5, 2024, **BAYNES** and CW-1 met and discussed "Harun" and the potential that he would purchase guns for them. CW-1 obtained "Harun's" phone number[17] when **BAYNES** called "Harun" to try to set up a meeting between **BAYNES**, CW-1, and "Harun."  CW-1 passed the phone number along to agents. With this phone number, agents were able to identify "Harun" as **BETTS**.  Agents corroborated what **BAYNES** said about "Harun," in that they learned that **BETTS** is an assistant principal at a school in the Cleveland area.  They also confirmed that **BETTS** was an Army veteran.  Phone records obtained for **BAYNES'** cellular telephone show calls between **BAYNES** and **BETTS**.  **BAYNES** and CW-1 planned to meet with **BETTS**, a/k/a

---

[17] BETTS' phone number ends in 0946.  On April 30, 2024, agents served a subpoena on T-Mobile, the service provider and are waiting on a response.

"Harun," on Friday, April 19, 2024, to discuss **BETTS** purchasing firearms for them at a gun show.

*April 19, 2024, Meeting and Firearms Transaction*

57.     On April 19, 2024, **BAYNES** met CW-1 at **SUBJECT PREMISES 1**.  **BAYNES** and CW-1 talked about the guns they were going to obtain with **BETTS**' help. They planned to use **BETTS** to purchase at least 2 rifles, although **BAYNES** suggested he could purchase four. CW-1 said they were going to send the AR overseas that they purchased from **BAYNES** previously. CW-1 asked about pipe bombs. **BAYNES** responded by saying they could get pieces of pipe, cut them, and fit them for use as pipe bombs to ship to be put together over there. **BAYNES** also suggested putting "a bunch of dog chains you tape around the pipe bomb."

58.     **BAYNES** and CW-1 went to a hardware store where **BAYNES** gave instructions to CW-1 on how to make pipe bombs, while showing them where the necessary parts were to be found in the store. **BAYNES** advised CW-1 to break bottles and grind up the glass to put in the pipe bombs (*i.e.*, as shrapnel) and to add strychnine, so that "***if the glass don't kill them the poison will.***"

59.     While **BAYNES** and CW-1 were out, they ran into an unidentified ("U/M") male that **BAYNES** apparently knew.  **BAYNES** engaged the U/M in conversation.  Towards the end of the conversation, the following exchange occurred:

U/M:        Looking for a couple toys.

**BAYNES**:    What you need?

U/M:        I don't know.  Something little, revolver.

**BAYNES**:    OK, I'll keep you in mind.

As the conversation ended, **BAYNES** told the U/M, "I'll let you know next week." Then, after the conversation concluded, **BAYNES** said to CW-1: "See what I'm saying. I'm a gun man in this city."

60. After the trip to the hardware store, **BAYNES** tried to get in contact with **BETTS**. **BAYNES** said that **BETTS** would help them and might sell them his personal guns. **BAYNES** eventually contacted **BETTS**. Later that night, CW-1 met **BETTS** at **SUBJECT PREMISES 1**. CW-1 observed that **BETTS** drove **SUBJECT VEHICLE 1** when he arrived. CW-1 asked if **BETTS** knew what they were doing:

> CHS: Did he already tell you what's going on?
>
> **BETTS**: Yeah.
>
> **BAYNES**: I told him.
>
> CHS: He know I'm shipping them off?
>
> **BAYNES**: Yep.
>
> **BETTS**: I ain't heard what y'all said.

61. Despite pretending that he had not heard what they said, **BETTS** said he could get 2 or 3 AR's for them. He cautioned that any more might bring too much attention to them. He also explained that one problem was that he would have to fill out forms on the firearms that he bought. He discussed how if there were a problem with the guns being used in a crime later, he would pretend they blew up or he didn't know what happened to them. **BAYNES** told **BETTS** that where these rifles were going, he wouldn't have to worry about nothing. Later in the conversation, **BETTS** asked what caliber rifle they were looking for, wondering "if you looking for AK since you shipping it overseas." **BETTS** said those were more expensive. **BAYNES** said to just get these—referring to **BETTS'** AR rifle, because that was what they were using over there.

24

62.     **BETTS** then sold his personal AR style rifle to CW-1 for $750. CW-1 told **BETTS**, "Them brothers want these right here," referring to the AR rifle. **BETTS** also had a Taurus 10 mm pistol with him, which CW-1 also purchased.[18] **BETTS** explained that he carried a 10 mm pistol because "it hits hard." ATF Special Agent John Sabol gave a verbal opinion that these two firearms were manufactured outside the State of Ohio based on the make and model. The following photos show the two firearms **BETTS** sold to CW-1:





63.     When **BETTS** returned, they discussed the plan for going to a gun show in Berea, Ohio the next day. They agreed that **BETTS** would go alone to the gun show. CW-1 explained

---

[18] The two firearms that were ultimately purchased from **BETTS** were as follows: (1) an American Tactical Firearms, MilSport, 5.56 caliber rifle with serial number MSA126976, and (2) a Taurus, TH 10, 10-millimeter pistol with serial number AEM932392.

why he and **BAYNES** could not go in the gun show: "We both felons so we can't be in there." **BETTS** acknowledged this, "So you can't be in there."

64. That evening, while at **SUBJECT PREMISES 1**, CW-1 observed a large quantity of ammunition in the residence. **BAYNES** also gave CW-1 a suitcase full of magazines for AK style rifles. The suitcase also had a gas mask. **BAYNES** told CW-1, "I said this is a gift for you to send over there." The following photos show the suitcase, gas mask, and magazines:



65. After **BETTS** sold his rifle and pistol to CW-1, later in the evening **BETTS** commented that he felt "naked." He further explained, "You know I got to run home and grab my other gun." He further stated, "I don't like being out here without nothing."

### *April 20, 2024, Meeting and Straw Purchase*

66. The following day, on April 20, 2024, CW-1 met **BAYNES** at **SUBJECT PREMISES 1**. While they waited for **BETTS**, they discussed a plan to murder the president of the mosque (discussed further below) and going to Home Depot to look again at the parts necessary to make pipe bombs. While they were discussing this, **BETTS** arrived at **SUBJECT PREMISES 1** in **SUBJECT VEHICLE 1**. **BETTS** suggested using marbles and ball bearings in the pipe bombs. **BETTS** said the marbles were deadly. **BAYNES** said they would know how to put the

26

pipe bomb parts together overseas.  They discussed again what **BETTS** would purchase at the gun show that day in Berea, Ohio.  BETTS suggested that the CHS give him $2,500 instead of $2,000 for the firearms and explained he might be able to negotiate and get 3 AR rifles.  **BETTS** took $2,500 to buy the guns with a promise of $1,000 in payment afterwards.

67.     **BETTS** left for the gun show in **SUBJECT VEHICLE 1**.  While at the gun show, **BETTS** purchased three AR style rifles and a bag of magazines for CW-1 and **BAYNES**.  He also purchased an AR rifle for himself and went to a gun store nearby to purchase a new handgun, possibly with money that was left over from the money provided by CW-1. Surveillance was conducted of **BETTS** at the gun show.  The following photos show **BETTS** purchasing firearms and then storing them in **SUBJECT VEHICLE 1**:

 



68. ATF Special Agent John Sabol provided a verbal opinion that the firearms were manufactured outside the State of Ohio based on the make and model. The following photos show the rifles **BETTS** purchased for CW-1:[19]



---

[19] The three firearms that were ultimately purchased from BETTS were as follows: (1) an American Tactical Imports, Omni Hybrid, multi-caliber rifle with serial number NS399119, (2) an Anderson Manufacturing, AM-15 multi-caliber rifle with serial number 24030793, and (3) an E3 Arms, Omega-15, multi-caliber rifle with serial number EV04858.





69.    While **BETTS** was at the gun show, **BAYNES** and CW-1 went to Home Depot where **BAYNES** walked the aisles with CW-1, explaining to him how to make pipe bombs and showing, and providing information to CW-1 about the parts that were needed to build those bombs.  **BAYNES** inquired of a store employee if he could purchase 500 pieces of aluminum pipe.

70.    **BAYNES** told CW-1 they could trust **BETTS**.  According to **BAYNES**, "I did things with him."  **BAYNES** further explained that **BETTS** "put guns in his name for me." **BAYNES** and CW-1 returned to **SUBJECT PREMISES 1** to wait for **BETTS**.

71.    After **BAYNES** heard from **BETTS** that he was on the way back to **SUBJECT PREMISES 1**, **BAYNES** and CW-1 discussed the guns they would be shipping overseas and what the recipients would do with them.  **BAYNES** stated, "Watch how quick they convert them," meaning to fully automatic.

29

72.    **BETTS** returned in **SUBJECT VEHICLE 1** to **SUBJECT PREMISES 1** with the rifles he purchased for CW-1 and **BAYNES**.  He explained that he got optics for each rifle and extra magazines.  CW-1 commented how the recipients were really going to love the scopes on the rifles.  **BAYNES** commented, "Yep."

73.    After **BETTS** came back inside **SUBJECT PREMISES 1**, they talked more with **BETTS** about the rifles.  CW-1 asked **BETTS** about what ammunition they should send.  **BETTS** said regular ammunition.  CW-1 also asked if they should send 7.62's over there. **BETTS** responded, "In that region they always use AK ammo," but also explained that they had 5.56 mm ammunition too, so it really didn't matter.  **BETTS** also advised, "With AR's, let them know they need to keep them greased.  It don't matter if they're over-greased.  They got to keep them greased. That's the first thing because if they don't keep them greased, they start getting hiccups.  They don't shoot straight."  **BETTS** further explained by pointing to a spot on a rifle, "Here, it's going to start getting sandy, especially over there, they got to keep it greased at all times.  Keep it greased at all times."  **BETTS** offered to help purchase additional rifles any time.

74.    While **BETTS** was at **SUBJECT PREMISES 1**, he also made several statements about his firearms possession.  For example, he stated that for him, walking around with an unloaded gun "don't work."  He also explained, "When I drive, if I got my AR in my car, it's loaded."  **BETTS** stated, "I never drive without my AR loaded, and that's purposeful."  CW-1 asked **BETTS**, "So how many you got in your collection right now?"  **BETTS** responded, "I ain't got that many anymore." **BETTS** then said he had to "restock up."

*April 26 and May 3, 2024, Meetings*

75.    After **BETTS** straw-purchased the firearms on April 20, 2024, and indicated that he would help purchase additional firearms, CW-1 and **BAYNES** anticipated meeting with

BETTS again on April 26, 2024.  Prior to that meeting, according to **BAYNES**, **BETTS** called him and expressed reluctance to purchase more firearms.  At first according to **BAYNES**, **BETTS** complained that he was not making enough money from the straw purchases.  Then **BETTS** said he was scared.  By the time that **BAYNES** and CW-1 met on April 26, 2024, **BETTS** was no longer returning phone calls from **BAYNES**.

76.     **BAYNES** and CW-1 went ahead with their meeting on April 26, 2024.  **BAYNES** explained that **BETTS** was scared and said **BETTS** thought the guns were for **BAYNES** and not for CW-1.  **BAYNES** explained that he told **BETTS** that the guns were for him and that "what's for me is what's for him (referring to CW-1)."  CW-1 and **BAYNES** had the following exchange:

> CW-1:        You know where they are going, right?
>
> **BAYNES**:    Yeah.
>
> CW-1:        You know, I mean, you know where they going?
>
> **BAYNES**:    Yeah, overseas.

77.     While discussing **BETTS**' new reluctance to help, **BAYNES** commented, "If I feel that you's a threat to my life or freedom, you got to go." Although **BAYNES** did not think **BETTS** was a threat, he said he did not understand why **BETTS** was not willing to help now since in the past **BETTS** had claimed guns that were confiscated from **BAYNES** as his own to help **BAYNES**.

78.     During the discussion, **BAYNES** commented that all the clips [meaning the ones he provided] can fit the weapons they have over there.  **BAYNES** mentioned he had a lot of "carbine" ammunition, as well as small amount of shotgun shells.  **BAYNES** also talked about taking carbine shells apart and putting them in a pipe bomb with nails, glass, shotgun buckshot, and gunpowder.

79.     On May 3, 2024, **BAYNES** and CW-1 met again. CW-1 told **BAYNES** that the shipment with the guns had gone out. CW-1 asked what they should do now and if they should wait a few months before doing it again. **BAYNES** responded, "We got to wait till we find somebody because he's [**BETTS**] scared to death." **BAYNES** continued to be surprised at **BETTS**' reluctance to keep helping them: "I know he's stronger than that and he's down because he's been on missions with me."

### *Murder-for-Hire Plot*

80.     In addition to selling and obtaining firearms, **BAYNES** also engaged in a murder-for-hire plot. **BAYNES** was involved in an ongoing dispute with the president of the mosque he attends, an individual referred to herein as Victim 1. **BAYNES** threatened to kill Victim 1 and asked CW-1 to do it. In return, **BAYNES** offered to let CW-1 keep the firearm **BAYNES** planned to provide to commit the murder.

81.     On April 7, 2024, **BAYNES** called CW-1 to say he had been kicked out of the mosque he attended by Victim 1, the President of the Board at the mosque. **BAYNES** said he and Victim 1 got in a verbal altercation at the mosque in the morning, and Victim 1 told him to leave. Victim 1 said he would call the police on **BAYNES** if he came back to the mosque. This call was not recorded.

82.     Victim 1 contacted the police. Agents have reviewed police reports regarding this incident. According to the police reports, on April 7, 2024, Victim 1 reported that **BAYNES** had threatened to kill him, reached in his pocket, and said, "I'll shoot you right now." However, **BAYNES** never actually pulled out a gun.

83.     Later in the day on April 7, 2024, CW-1 spoke with Victim 1 on the phone. Victim 1 said **BAYNES** threatened to kill people at the mosque and threatened to kill people after

32

Ramadan. Victim 1 said **BAYNES** threatened to shoot someone that morning, and that **BAYNES** has a history of pulling guns on people in the mosque.

84.     On April 12, 2024, **BAYNES** and CW-1 planned on driving together to the mosque for prayer. CW-1 picked **BAYNES** up from **SUBJECT PREMISES 1**. CW-1 observed **BAYNES** exit **SUBJECT PREMISES 1** and enter CW-1's vehicle. Upon entry, **BAYNES** handed CW-1 a fully loaded Smith and Wesson revolver with serial number CDU0105 to hold for **BAYNES**. While passing by Wade Park on the way to the mosque, **BAYNES** mentioned that he "put at least 10 bodies in that park." **BAYNES** and CW-1 eventually went to prayer. After prayer, there was a board meeting where **BAYNES** and Victim 1 presented their cases as to why **BAYNES** should or should not be allowed back. During the course of the argument, **BAYNES** admitted to threatening Victim 1.  Another individual spoke up and accused **BAYNES** of also threatening to shoot him after he touched **BAYNES'** foot while praying. After the meeting, CW-1 eventually dropped **BAYNES** off at the **SUBJECT PREMISES 1**.  When they arrived, **BAYNES** took back the revolver he had previously given CW-1. **BAYNES** went directly inside of **SUBJECT PREMISES 1** with the firearm.

85.     On April 19, 2024, CW-1 met with **BAYNES** at **SUBJECT PREMISES 1,** as described above.  When CW-1 arrived, **BAYNES** discussed CW-1 killing Victim 1.  **BAYNES** showed CW-1 several Cleveland police uniforms that he had.  **BAYNES** said CW-1 should wear the uniforms when CW-1 killed Victim 1.  **BAYNES** explained that he used to wear these uniforms in the past "when we go hit guys."  **BAYNES** told CW-1, "That boy [Victim 1], he got to go." **BAYNES** took CW-1 to see Victim 1's house and pointed out where traffic cameras were located. Outside Victim 1's residence, **BAYNES** discussed how CW-1 should commit the murder.  After CW-1 asked if they should take the body and try to hide it, **BAYNES** told him to "just blast him,"

and then repeated to "blast him right where he is."  **BAYNES** told CW-1 that "[Victim 1] got to die."  Later that day, they discussed how CW-1 would commit the murder when **BAYNES** was in the hospital to give **BAYNES** an alibi.  **BAYNES** also said CW-1 should use **BAYNES**' revolver, and that CW-1 should wear a mask.  As they discussed this further that day and the next, **BAYNES** decided that this murder should wait until later in the summer.

86.     During the meeting on April 26, 2024, CW-1 asked **BAYNES** how much he thought he could get for the revolver that CW-1 believed **BAYNES** intended to provide for CW-1 to use to murder Victim 1.  (This referred to the same revolver described above that **BAYNES** temporarily provided to CW-1 on April 12, 2024.)  **BAYNES** said it was worth $500 to $600.  The CHS then asked **BAYNES** if he still wanted them to "knock him off with that" (referring to Victim 1), would **BAYNES** let them keep the revolver as payment.  **BAYNES** said he got something to "knock him off" that was even better.  **BAYNES** explained the revolver was sentimental to him because his grandmother's name was on it.  CW-1 then asked how much it would cost, **BAYNES** responded, "Nothing, nothing it's going to be brand spanking new and it's going to be a revolver." **BAYNES** told the CW-1 if his "guy" didn't have what he wanted, referring to the type of gun, "Just gotta swing with that," talking about his revolver. **BAYNES** told CW-1 he could clean any revolver up and explained how he would clean it.

87.     On May 3, 2024, **BAYNES** and CW-1 again discussed the planned murder of Victim 1.  **BAYNES** again told CW-1, "[Victim 1] got to go."  CW-1 asked about the gun "you was going to give me for that," which was discussed in the meeting on April 26, 2024.  CW-1 asked if it would be a .357, and **BAYNES** responded, "Bulldog," which is a reference to a model of .357 caliber revolver.  **BAYNES** told CW-1 they could keep the gun after committing the murder, "If you use it for that you just gotta take it with you.  I'll clean it up for you again like it's

34

new.  You take it up there with you and you keep it and do what you doin'.  You can clean that gun over and over again."  CW-1 asked, "So I can keep that one for it?"  **BAYNES** answered, "Yep."  Your affiant has learned from conducting research online that a .357 Bulldog revolver sells for approximately $400.  **BAYNES** also explained again that the reason he was upset with Victim 1 was that he had called the police on him, declaring, "You can't call the police on nobody."  CW-1 told **BAYNES** to let him know when it was time to commit the murder by telling CW-1 when he would be in the hospital.  **BAYNES** offered as an alternative that he "might go out of town or something."   This discussion was consistent with the plan discussed earlier that CW-1 would commit the murder when **BAYNES** was in the hospital to create an alibi for **BAYNES**.

88.	Based on the discussions between **BAYNES** and CW-1, **BAYNES** was aware that CW-1 lived in Pennsylvania, that CW-1 traveled from Pennsylvania to Ohio to meet with **BAYNES**, and that CW-1 would have to travel from Pennsylvania to Ohio to commit the murder of Victim 1.

### *SUBJECT PREMISES 1*

89.	Open-source database checks indicate that **BAYNES** resides at **SUBJECT PREMISES 1** by himself.  **SUBJECT PREMISES 1** is **BAYNES**' listed residence on his Ohio driver's license. As of 2018, Cuyahoga County Court documents list **BAYNES'** residence as the **SUBJECT PREMISES 1**.   Records obtained from banking and telephone companies list **BAYNES'** residence as **SUBJECT PREMISES 1**.   On March 22, 2023, and April 19, 2024, search warrants were signed in the Northern District of Ohio, case number 1:24mj2079, authorizing the collection of precise location information for **BAYNES'** cellular telephone number ending in 0333 for periods of 30 days. The location data received in response to these warrants has consistently shown that **BAYNES'** cellular telephone has been present in **SUBJECT PREMISES**

35

**1** during time periods consistent with **BAYNES** residing at **SUBJECT PREMISES 1**.  CW-1 has also met with **BAYNES** at **SUBJECT PREMISES 1** and been invited inside.  While inside **SUBJECT PREMISES 1**, CW-1 observed that it appeared **BAYNES** was living there.  CW-1 did not observe evidence of anyone else residing at **SUBJECT PREMISES 1**.

### SUBJECT PREMISES 2

90.     **SUBJECT PREMISES 2** is believed to be **BETTS'** current residence.  Although government database checks for **BETTS** showed a different address, agents conducting surveillance at that address have not observed **BETTS** or his vehicle present.  Agents also observed other individuals and vehicles present, but not **BETTS** or his vehicle.  Agents conducting surveillance on **SUBJECT PREMISES 2** have observed **BETTS** and his vehicle coming and going at hours consistent with **BETTS** residing there.  Agents have also observed that access to the building is controlled by a key card system, and **BETTS** was observed accessing the building by himself through a controlled entry, which would indicate that he has a keycard.  **SUBJECT PREMISES 2** is an apartment that is rented to a relative of **BETTS**.  This consistent with a statement made by **BAYNES** to CW-1 about **BETTS**.  On May 3, 2024, when talking about **BETTS, BAYNES** told CW-1 that he had told **BETTS** that by making money from buying guns for CW-1, "You can get your own spot instead of living with your cousin."

### SUBJECT VEHICLE 1

91.     **SUBJECT VEHICLE 1** is the vehicle that **BETTS** has used when traveling to meet with **BAYNES** and CW-1 at **SUBJECT PREMISES 1**.  **BETTS** also used this vehicle to go to the gun show on April 20, 2024, and transport the firearms he purchased back to **SUBJECT PREMISES 1**.  Ohio motor vehicle records show that **SUBJECT VEHICLE 1** is registered to

36

**BETTS**.  Agents conducting surveillance have observed **BETTS** using this vehicle to travel to and from his residence at **SUBJECT PREMISES 2** and his place of employment.

### *General Information About Firearms*

92.     Based on my training and experience I know that individuals who possess firearms typically keep them in their residences, along with accessories such as magazines, clips, ammunition, holsters, cleaning kits, and records related to the purchase, sale, possession, transportation, and shipping of firearms and ammunition.  I know that one common place to store firearms is in a gun safe, a safe, or other lockable storage container.  I also know that criminals who engage in trafficking firearms often utilize residences to store evidence of their criminal activities, to include firearms, ammunition, currency, inventory, ledgers, notes, electronic devices, and manufacturing tools and devices.  In addition to their residences, I also know that people who possess firearms also commonly possess them in their motor vehicles.  Motor vehicles are also a common place where individuals stash or discard receipts for purchases, which include receipts for purchases of ammunition, firearms, firearms accessories, or range time.  People who keep firearms in their motor vehicle also commonly keep concealed carry permits or similar paperwork related to their firearms in the vehicle where they keep the firearms.  Consistent with this, as described above, **BETTS** described traveling with his loaded AR-style rifle in his vehicle.

### *Cellular Telephones and Other Devices*

93.     I further know based on training and experience that criminals often use cellular telephones or other electronic devices to coordinate purchases and sales of firearms, which are often kept with them at their residences. This coordination can include sending and receiving communications, arranging sales and payments, searching the Internet for firearms and related items for sale, transferring funds, and using a device's map function to determine the location for

sales, purchases, or storage of firearms.  Criminals also often store communications, photos, records, receipts, notes, ledgers, financial information, electronic data, and other items relating to the importation, transportation, ordering, purchasing, and distribution of firearms in their electronic devices and electronic data storage devices, such as computers, tablets or cellular telephones. This evidence is helpful not only to establish the nature of the criminal acts, but also to identify the co-conspirators and the suspect's state of mind.  For example, in this investigation I know that **BAYNES** used Instagram, a social media application on his cellular telephone, to communicate regarding the sale of firearms, including receiving photographs of firearms for sale and discussing the price of firearms.  I also know that individuals typically keep their cellular telephones on their persons or within their immediate reach, such as in the vehicle they are in. Consistent with this, CW-1 has observed **BAYNES** regularly in possession of his cellular telephone during their meetings.  CW-1 similarly observed **BETTS** in possession of a cellular telephone, an iPhone with a black case, when BETTS was at **SUBJECT PREMISES 1** on April 20, 2024.  While at the gun show purchasing firearms on April 20, 20224, **BETTS** called **BAYNES**.  The following photo taken by agents conducting surveillance of **BETTS** also shows him looking at a cellular telephone while at the gun show:



Therefore, I believe that records, information, and evidence related to the **TARGET OFFENSES** are likely contained on electronic storage devices such as cellular telephones, tablets, or computers in **SUBJECT PREMISES 1, SUBJECT PREMISES 2, SUBJECT VEHICLE 1,** or on the persons of **BAYNES** and **BETTS**.

## TECHNICAL TERMS

94. Based on my training and experience, I use the following technical terms to convey the following meanings:

95. <u>Storage medium:</u> A storage medium is any physical object upon which computer data can be recorded. Examples include external hard drives, USB drives, "thumb" drives, hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

96. <u>Computer:</u> For purposes of this Affidavit, any reference to a computer includes any electronic device capable of storing data, to include computers, tablets, laptops, cellular telephones, "smart" watches, personal data assistants, or any other similar electronic device.

39

**COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

97.     As described above and in Attachments B1 and B2, this application seeks permission to search for records that might be found on the **SUBJECT PREMISES 1** and **SUBJECT PREMISES 2**, in whatever form they are found.  One form in which the records might be found is data stored on a computer or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

98.     Probable cause.  I submit that if a computer or storage medium is found on the **SUBJECT PREMISES 1** and **SUBJECT PREMISES 2**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

99.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

100.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

101.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used,

what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

102.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

103.    Forensic evidence.  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **SUBJECT PREMISES 1** and **SUBJECT PREMISES 2** because:

104.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files

41

were created and the sequence in which they were created, although this information can later be falsified.

105. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated

into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

106.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

107.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

108.    Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present

43

on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

109.    Necessity of seizing or copying entire computers or storage media.  In most cases, a thorough search of a premises for information that might be stored on a computer or storage media often requires the seizure of the physical computer or storage media and later off-site review consistent with the warrant. In lieu of removing a computer or storage media from the premises, it is sometimes possible to make an image copy of storage media.  Imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

110.    The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

111.    Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the

search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

112. <u>Variety of forms of electronic media</u>. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

113. <u>Nature of examination</u>. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

### BIOMETRICS

114. The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

115. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These

biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

116.    If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

117.    If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

118.    In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

46

119. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

120. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

121. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is

47

found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

122. Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## CONCLUSION

123. Based upon the foregoing, I submit that there is probable cause that **BAYNES**, **BETTS**, and others have committed and are committing the TARGET OFFENSES and that evidence, fruits, and instrumentalities of the TARGET OFFENSES, more specifically described in Attachments B-1, B-2, B-3, B-4, and B-5, are located at the locations more specifically described in Attachments A-1, A-2, A-3, A-4, and A-5.

124. Further I submit that there is probable cause that **BAYNES** and **BETTS** have violated Title 18, United States Code, Section 922(d)(1), Selling or Disposing of a Firearm to a Convicted Felon; Title 18, United States Code, Section 932(b), Conspiracy to Straw Purchase Firearms; Title 18, United States Code, Section 933(a)(1), Firearms Trafficking; and Title 18,

United States Code, Section 933(a)(1) and (3), Firearms Trafficking Conspiracy; and There is also probable cause that **BAYNES** has violated Title 18, United States Code, Section 554(a), Attempted Smuggling of Goods from the United States; Title 18, United States Code, Section 922(g)(1), Felon in Possession of a Firearm; and Title 18, United States Code, Section 1958(a), Murder-for-Hire. Finally, there is probable cause that **BETTS** has also violated Title 18, United States Code, Section 932(b), Straw Purchasing of Firearms.

Respectfully submitted,

Michael Mitchell
Special Agent
Federal Bureau of Investigation

Sworn to via telephone after submission by reliable electronic means.
Fed. R. Crim. P. 4.1 and 41(d)(3). This 9th day of May 2024.



James E. Grimes Jr., United States Magistrate Judge

49